UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| JOSEPH GOFORTH, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 4:23-CV-1157 SRW |
| | ) |
| BI-STATE DEVELOPMENT | ) |
| AGENCY OF THE MISSOURI- | ) |
| ILLINOIS METROPOLITAN | ) |
| DISTRICT, et al. | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM AND ORDER**

This matter comes before the Court on Defendant Bi-State Development Agency of the Illinois-Missouri Metropolitan District's Motion to Dismiss, or in the Alternative, for More Definite Statement (ECF No. 7) and Defendant Kevin Scott's Motion to Dismiss, or in the Alternative, for More Definite Statement (ECF No. 16). The motions are fully briefed and ready for disposition. The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to Title 28 U.S.C. § 636(c). For the following reasons, Defendants' Motions will be granted, in part, and denied, in part.

I.  BACKGROUND

In June 2023, Plaintiff Joseph Goforth filed this employment discrimination action against Defendants in the Circuit Court of St. Louis City alleging Defendants discriminated, harassed, and retaliated against him while he was employed at Defendant Bi-State. Plaintiff asserts four counts against Defendants under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq*., and 42 U.S.C. § 1983: (1) Termination – Retaliation; (2) Improper Termination Based on Race; (3) Hostile Work Environment; and (4) Race Based

1

Unlawful Deprivation of Federally Protected Rights under the Equal Protection Clause of the Fourteenth Amendment. The first three counts are under Title VII and the fourth is under § 1983. In September, Defendant Bi-State removed the matter to this Court. Defendants now seek dismissal of Plaintiff's petition, asserting Plaintiff fails to state a claim and failed to exhaust his administrative remedies prior to filing this action.

The Court accepts the following facts as alleged in the petition as true:

Plaintiff Joseph Goforth, an African American, began working for Bi-State in July 2015 as a public safety officer. Over the next five years, he was promoted to various positions and did well, receiving good evaluations and numerous bonuses for the quality of his work. He did not receive any negative evaluations. Eventually, he was promoted to Transit Security Specialist Team Leader, and he worked the second shift. In 2019, Mr. Scott, who is white, became Mr. Goforth's boss.

In November 2020, Mr. Goforth approached Steven Berry, the general manager of Public Safety, in the parking lot at the "main shop." Mr. Goforth told Mr. Berry that, compared to white officers, all of the black officers were being unfairly fired without warnings, write-ups, or progressive discipline. Mr. Goforth advised Mr. Berry that black officers were held to a different standard and given harsher and more extreme punishments compared to white officers. Mr. Berry asserted Mr. Scott wants to fire everyone, black or white. This was an attempt on the part of Mr. Berry to protect Mr. Scott.

Bi-State is well aware of the systemic racism problem. In June 2020, Taulby Roach, President and Chief Executive Officer of Bi-State, sent out a company-wide email wherein he acknowledged bias, institutional racism, and prejudice still exist within the community.

On March 1, 2021, Mr. Goforth became aware of a problem from Transit Security Specialist ("TSS") Sadie Tull. She told Mr. Goforth TSS Richard Tate was sexually harassing her by constantly making explicit sexual comments to her that made her feel uncomfortable. TSS Tull also stated that TSS Tate made several inappropriate racial comments about the fact that she was dating African Americans. She also reported that TSS Tate made threats towards her because she was not complicit and receptive to his advances. There is evidence of these inappropriate advances and threats from TSS Tate to TSS Tull. This includes text messages, voice mail, and a log. Mr. Goforth did not have knowledge of the evidence before that time.

After TSS Tull informed Mr. Goforth of TSS Tate's actions, he told TSS Tull she was cleared to contact TSS Field Supervisor Tony Smoote, which she apparently did. Mr. Goforth also contacted Supervisor Smoote, who instructed Mr. Goforth to submit a memorandum on the matter. Mr. Goforth did so that same day. The following day, March 2, TSS Tull submitted her memorandum on the matter to Mr. Goforth as well. On March 3, TSS Tull sent an email to Supervisor Smoote about sexual advances from TSS Tate including asking her out to eat and drink, and trying to date her. TSS Tull firmly stated no on several occasions, but TSS Tate would not let up. While TSS Oerter[1] was not as explicit as TSS Tate, TSS Tull still felt uncomfortable being around him.

Amie Weber, Bi-State's EEO Investigator, investigated both of these complaints from TSS Tull. Mr. Goforth met with Ms. Weber in March 2021, at the Central Facility at 3330 Spruce Street, known as the "main shop." Ms. Weber asked for permission to record the interview, and Mr. Goforth consented to being recorded. Mr. Goforth responded to Ms. Weber's

---

[1] In the petition, Plaintiff alleges TSS Oerter was not as explicit, even though the prior sentences refer to TSS Tate. The Court does not know if all of the allegations in this paragraph should be about TSS Oerter, or if this one sentence is a typo. It is unclear what Plaintiff intended in this paragraph.

3

questions and told Ms. Weber he first learned about the incident from TSS Tull on March 1. Ms. Weber asked if he was aware of any inappropriate or explicit sexual discussions that occurred during roll calls, to which Mr. Goforth responded he was not aware of it.

 Mr. Goforth told Ms. Weber there were other issues within the Public Safety Department. He told her morale was low because Mr. Scott engaged in discriminatory behavior toward African American employees compared to white employees. He also reported to her that Mr. Scott engaged in deceitful conduct and was able to get away with it because of his political connections, race, and position as general manager. Mr. Goforth described the special privileges Mr. Scott gave only to white officers including special parking on the main parking lot, being able to take home company vehicles, having locked office doors, having windows covered for absolute privacy, and being assigned personal computers.

 Mr. Goforth also reported to Ms. Weber that black officers were kicked out of their original offices and moved to a small, eight-by-twenty-feet office that four officers had to share with only one computer. The black officers were not allowed to have a key to this office even though it contained sensitive and classified documents. Mr. Goforth and other black officers felt disheartened and were stressed to experience this discrimination where white officers were given better opportunities and advantages because of their race. This had a detrimental effect on Mr. Goforth's health.

 Before being kicked out of the original office, Mr. Scott walked into the office and told Gerald Abernathy that he did not want any doors locked. Two months later, the Special Operations Unit (all white officers) moved in. Immediately, they were allowed to keep their door closed and locked, even during business hours. As opposed to the black officers who had used

4

the office before, the white officers were allowed to cover up the glass windows with newspaper for privacy.

When Mr. Goforth spoke with Ms. Weber, he told her Mr. Scott would retaliate against him for speaking to her by having him fired. Ms. Weber stated that Bi-State does not tolerate or allow retaliation because it is against company policy. In April of 2021, Mr. Goforth met with Ms. Weber again. This time she requested that TSS Team Lead Matthew Meinen join the meeting. Like the first time, Ms. Weber asked both Mr. Goforth and Mr. Meinen if they consented to her recording the interview. In this interview, Mr. Goforth repeated what he told Ms. Weber in the first interview. Ms. Weber told Mr. Goforth and Mr. Meinen that, as supervisors, they needed to be more careful of their subordinates and how they conducted themselves.

At the meeting, Ms. Weber also raised another incident involving Mr. Meinen and TSS Williams that involved inappropriate conversations and physical contact between the two. Mr. Goforth stated he had no knowledge of the incident and had not been informed of it. This should have been reported to him, but was not. Mr. Meinen also told Ms. Weber that Mr. Goforth and he would be "whistle-blowers" on Mr. Scott. He stated that Mr. Scott wanted to terminate half of the transit security specialists that were all black. Mr. Goforth reiterated this point to Ms. Weber. Mr. Goforth told Ms. Weber that seven to eight months prior, Mr. Scott wanted to terminate the following black transit security specialists: M. Mosley (who was fired), M. Weaver (who was fired), Mr. Goforth (who was fired), L. Brown (who resigned), S. Dorsey, and L. Lowman.

Later, Mr. Meinen and Mr. Goforth were in Supervisor Smoote's office when Mr. Goforth was told he should be worried because Mr. Scott told Vernon Summers, the Director of Field Security, that he wanted to fire half of the specialists. Mr. Scott was informed he could not

5

do that. At the meeting with Ms. Weber, Mr. Goforth told her that in January 2021, he spoke with a representative from a labor union who had approached each TSS as they walked into the building. This was to get protection from Mr. Scott because word had gotten out that Mr. Scott wanted to fire everyone who agreed to unionize the Public Safety Department.

Mr. Goforth also told Ms. Weber that Mr. Scott had disarmed all of the contract security officers and the specialists who were either police officers or ex-police officers with Missouri "P.O.S.T." training. Mr. Scott wrongfully asserted they were not authorized to carry firearms under the Bi-State Development Compact. Mr. Scott knew this was wrong because he allowed St. Louis City Sheriff's deputies to carry firearms even though they are not commissioned officers and have no academy training. In St. Clair County, by contrast, the correctional officers and jailers are allowed to be armed on Metro's system.

Mr. Goforth reported to Ms. Weber that Mr. Scott does whatever he wants knowing there are no consequences for him. This is why he acts superior and condescending to the black officers. Mr. Goforth stated that Mr. Scott gives false information that is detrimental to officers leading to them being unjustly fired. Mr. Goforth informed Ms. Weber about TSS James Cook, who was killed in the line of duty at the Delmar Metro Link station in January 2021. Mr. Cook was not armed and tried to defend himself with a can of mace. Mr. Goforth told Ms. Weber that Mr. Scott was directly responsible for Mr. Cook's death.

Ms. Weber advised Mr. Goforth she was going to recommend TSS Oerter be moved to another shift from TSS Tull and take classes on sexual harassment. She also stated she could not confirm if the allegations against TSS Tate were true, but she suspected the other officers were protecting him and imposing a code of silence that kept Mr. Goforth from knowing about the situation. She did say she had spoken with TSS Tate on a consistent basis about this problem.

On May 11, 2021, Mr. Goforth was terminated by a letter which referenced an EEO investigation about his alleged misconduct. The letter stated it confirmed Bi-State's decision to terminate him because it found credible allegations he engaged in or permitted sexually explicit behavior or conversations during roll call and failed to properly supervise subordinates in accordance with Bi-State's expectations. Mr. Goforth did not engage in any sexually explicit behavior at any time or during roll call, he did not know about it occurring during roll call, and he did not fail to properly supervise his subordinates.

**II.     STANDARD**

The purpose of a motion to dismiss for failure to state a claim is to test the legal sufficiency of the complaint. As the Supreme Court held in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), a complaint must be dismissed pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted if it does not plead "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. A plaintiff need not provide specific facts in support of his allegations, *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam), but must include sufficient factual information to provide the "grounds" on which the claim rests, and "to raise a right to relief above a speculative level." *Twombly*, 550 U.S. at 555 & n.3. *See also Schaaf v. Residential Funding Corp.*, 517 F.3d 544, 549 (8th Cir. 2008). This obligation requires a plaintiff to plead "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. A complaint "must contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." *Id.* at 562 (quotation omitted). On a motion to dismiss, the Court accepts as true all of the factual allegations contained in the complaint, and reviews the

7

complaint to determine whether its allegations show that the pleader is entitled to relief. *Id.* at 555-56; Fed. R. Civ. P. 8(a)(2).

### III. DISCUSSION

Defendants ask the Court to dismiss Plaintiff's petition for several reasons. First, Defendants assert the Court must dismiss count one for retaliation because Plaintiff fails to allege sufficient facts to demonstrate a causal connection between his participation in the EEO investigation and his termination. Second, Defendants argue the Court should dismiss count two for racial discrimination because Plaintiff fails to allege sufficient factual circumstances giving rise to an inference of discrimination. Third, Defendants contend Plaintiff's hostile work environment claim, count three, fails because Plaintiff does not allege sufficient facts severe or pervasive enough to give rise to an inference of racial harassment. Fourth, Defendants assert the Court must dismiss count four, the § 1983 claim, because Plaintiff fails to set forth specific allegations establishing Defendants' conduct caused a constitutional violation. Fifth, Defendants argue the Court must dismiss counts two and three because Plaintiff failed to exhaust his administrative remedies as to these counts. Finally, Defendant Scott asks the Court to dismiss counts one, two, and three against him because he is an individual and under Title VII, supervisors and employees cannot be individually liable. If the Court denies Defendants' motions to dismiss, Defendants ask the Court to order a more definite statement.

### A. Individual Claims Against Defendant Scott

Defendant Scott asserts the Court must dismiss counts one, two, and three against him because Title VII does not allow for individual liability against a supervisor or employee. Plaintiff concedes there is no liability against Defendant Scott under Title VII. Therefore, the Court will dismiss counts one, two, and three against Defendant Scott.

8

### B. Failure to Exhaust Administrative Remedies

Defendants argue the Court should dismiss counts two and three for race discrimination and hostile work environment because Plaintiff failed to exhaust his administrative remedies when he listed retaliation, but not race discrimination or a hostile work environment, as the basis for discrimination in his EEOC charge. Plaintiff asserts the Court should read the EEOC charge liberally and not so technically.

To exhaust administrative remedies, an individual must timely file a charge of discrimination with the EEOC setting forth the facts and nature of the charge. 42 U.S.C. § 2000e– 5(b), (c), (e). "Exhaustion requires a claimant to give notice of all claims of discrimination in the administrative complaint, but administrative complaints are interpreted liberally." *Price v. Harrah's Maryland Heights Operating Co.*, 117 F. Supp. 2d 919, 921 (E.D. Mo. Aug. 21, 2000) (citing *Cobb v. Stringer*, 850 F.2d 356, 359 (8th Cir. 1988)). The general rule in the Eighth Circuit is that "[a] plaintiff will be deemed to have exhausted administrative remedies as to allegations contained in a judicial complaint that are like or reasonably related to the substance of charges timely brought before the EEOC." *Wallin v. Minn. Dep't of Corr.*, 153 F.3d 681, 688 (8th Cir. 1998) (quoting *Williams v. Little Rock Mun. Water Works*, 21 F.3d 218, 222 (8th Cir. 1994)). "To determine whether the allegations of a complaint are reasonably related to claims of discrimination in an administrative charge, courts customarily look to the substance of the administrative charge." *Almoghrabi v. GoJet Airlines, LLC*, 2015 WL 1061118, at *4 (E.D. Mo. Mar. 11, 2015).

In *Ford v. Delta Airlines*, the plaintiff asserted claims for race discrimination and retaliation. 2013 WL 5651384 at *1 (E.D. Mo. Oct. 15, 2013). However, on his EEOC charge form, he only checked the box for "retaliation." *Id*. at *2. In his EEOC charge, he stated he filed

a complaint with his human resources department about race discrimination and a hostile work environment and then he was suspended without pay. *Id*. The Court found that the plaintiff's complaint was not reasonably related to the substance of the allegations in his EEOC charge because his EEOC charge did not mention any alleged racial discriminatory conduct. *Id*. The Court stated, "Although plaintiff asserted in the charge that the protected activity for which he was allegedly retaliated against was based on a previous complaint of race discrimination, plaintiff made no allegations indicative of race discrimination in his EEOC charge." *Id*. at *3.

This same analysis applies to the EEOC charge and petition in this case. In his EEOC charge, Plaintiff stated the discrimination was based on retaliation and included the following description:

> In 7/2015 I was hired by the above-named employer as a Transit Security Specialist Team Lead. Tony Smoot, Transit Security Specialist Supervisor, was my immediate supervisor. I made a race-based complaint and subsequently, I was discharged in retaliation. In 4/2021, I made two race-based complaints to Amy Webber EEO Officer about Kevin Scott, GM of Field Security and his treatment of African American workers. This treatment included harsh disciplinary procedures and less favorable working conditions than that of our Caucasian co-workers. Both complaints were recorded for the record. Subsequently, I was discharged on 5/11/2021. For the above stated reasons, I believe that I was retaliated against, after engaging in protective activity under the statute, in violation of Title VII of the Civil Rights Act of 1964, as amended.

ECF No. 8-1, at 2. Plaintiff's EEOC charge does not include facts indicating he experienced race discrimination or a hostile work environment. Although he references the content of the complaints he made to the EEO officer, the substance of his charge is about the retaliation he faced, not any race discrimination or a hostile work environment he faced before the retaliation. Thus, his race discrimination and hostile work environment claims are not reasonably related to the retaliation charge. *See, e.g., Williams*, 21 F.3d at 222 (8th Cir.1994) (noting that plaintiff's EEOC charge left the "race" box empty and failed to "allege any facts in the narrative section of her charge which raise the issue of race discrimination"); *Duncan v. Delta Consol. Indus., Inc.*,

10

371 F.3d, 1020, 1025 (8th Cir. 2004) *abrogated on other grounds by Torgerson v. Rochester*, 643 F.3d 1031 (8th Cir. 2011) (noting plaintiff's EEOC charge left the "sex" box empty and "charges of sexual harassment generally are not like or reasonably related to retaliation charges for complaining about antecedent harassment").

Because Plaintiff's race discrimination and hostile work environment claims are not reasonably related to his EEOC charge, Plaintiff has not exhausted his administrative remedies as to those claims. Therefore, the Court must dismiss counts two and three for failure to exhaust.

    C.    **Retaliation Claim Against Defendant Bi-State**

Defendant Bi-State asserts the Court must dismiss Count one for retaliation because Plaintiff fails to allege sufficient facts to demonstrate a causal connection between Plaintiff's participation in the EEO investigation and his termination.

To establish a retaliation claim under Title VII, Plaintiff must allege "he engaged in statutorily protected conduct, that he suffered an adverse employment action, and that the protected conduct was a but-for cause of the adverse action." *Bennett v. Riceland Foods, Inc.*, 721 F.3d 546, 552 (8th Cir. 2013). "Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013). In *Wilson v. Arkansas Department of Human Services*, the Eighth Circuit held that the plaintiff sufficiently pleaded a claim for retaliation when she alleged she complained about discrimination based on race and was terminated. 850 F.3d 368, 373 (8th Cir. 2017). The court found that her allegation stating she was a "victim of . . . retaliation, after having complained" sufficiently alleges but-for causation. *Id*.

In this case, Plaintiff sufficiently alleges Defendant Bi-State retaliated against him for cooperating with the EEO investigation and making a verbal complaint against Defendant Scott.

11

Although Plaintiff mistakenly states his complaints about Defendant Scott were a motivating factor, rather than but-for causation, of his termination, the factual allegations he included in his complaint sufficiently establish a causal connection. Plaintiff alleged he met with the EEO officer multiple times and during these meetings, he described Defendant Scott's discriminatory conduct and also stated his belief that Defendant Scott would retaliate against him for speaking to her. After speaking with the EEO officer in March and April 2021, Defendant Bi-State terminated Plaintiff on May 11, 2021. *See Wilson*, 850 F.3d at 373 ("the six-week period between the EEOC charge and the termination plausibly alleges a but-for causal connection."). Plaintiff specifically alleges that the reasons Defendant Bi-State gave for his termination were false and a pretext.

Although Plaintiff's petition appears to reference the incorrect causation standard, his factual allegations sufficiently plead a plausible claim for retaliation. *Wilson*, 850 F.3d at 372 ("The plaintiff's burden at the prima facie case state of the analysis is not onerous."). Therefore, the Court will not dismiss count one against Defendant Bi-State.

> D.   **Section 1983 Claim**

Defendants argue Plaintiff's § 1983 claim fails because he did not set forth specific allegations establishing Defendants' allegedly wrongful conduct caused a constitutional deprivation. Defendants assert that the petition does not state what Defendants did, or failed to do, that caused a violation of Plaintiff's rights.

In his petition, Plaintiff asserts a claim under § 1983 for a violation of the Equal Protection Clause of the Fourteenth Amendment. The Equal Protection Clause confers on an individual a right to be free of racial discrimination in public employment. *Henley v. Brown*, 686

F.3d 634, 641 (8th Cir. 2012). To state a claim under § 1983, a plaintiff must plead facts that establish the defendant's wrongful conduct caused the constitutional deprivation.

Plaintiff does not sufficiently allege that Defendants' allegedly racially discriminatory conduct caused his termination, which he asserts is the Equal Protection violation. Throughout his petition, Plaintiff alleges he participated in an EEO investigation about several issues, one of which was Defendant Scott's racially discriminatory behavior towards black employees. While Plaintiff alleges he told the EEO investigator Defendant Scott wanted to fire him because he was black, his allegations do not establish this was the reason he was actually fired. Instead, the allegations show Plaintiff was fired for participating in the EEO investigation. The petition does not state a claim for relief under § 1983 against Defendants that is plausible on its face. For this reason, the Court must dismiss count four.

E.     **Motion for a More Definite Statement**

Defendants ask the Court to order a more definite statement if the Court does not grant their motions to dismiss in their entirety. Rule 12(e) governs motions for a more definite statement and provides:

> A party may move for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response. The motion must be made before filing a responsive pleading and must point out the defects complained of and the details desired.

A motion for more definite statement is proper when a party is unable to determine the issues, or where a material ambiguity or omission in the complaint renders it unanswerable. *Morgan v. Midwest Neurosurgeons, LLC*, 2011 WL 2728334, at *2 (E.D. Mo. July 12, 2011). Such motions are designed to remedy unintelligibility, rather than a lack of detail. *Id*. Given liberal notice pleading standards and the availability of discovery, motions for a more definite

13

statement are generally denied. *Id*. A motion for a more definite statement is not to be used to test an opponent's case or to substitute for discovery. *Id*.

The Court does not believe a more definite statement is needed in this case. The petition does not include a material ambiguity or omission that makes it unanswerable. The Court will deny Defendants' motions for a more definite statement.

Accordingly,

**IT IS HEREBY ORDERED** that Bi-State Development Agency of the Illinois-Missouri Metropolitan District's Motion to Dismiss, or in the Alternative, for More Definite Statement (ECF No. 7) is **GRANTED, in part, and DENIED, in part**. Counts two, three, and four are **DISMISSED**, without prejudice.

**IT IS FURTHER ORDERED** that Defendant Kevin Scott's Motion to Dismiss, or in the Alternative, for More Definite Statement (ECF No. 16) is **GRANTED**. All claims against Defendant Scott are **DISMISSED**, without prejudice.

So Ordered this 5th day of January, 2024.

_____
STEPHEN R. WELBY
UNITED STATES MAGISTRATE JUDGE